IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| DAVID V. JORDAN, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) Case No. 1:18-cv-228-SPB |
| | ) |
| LIEUTENANT MURIN, *et al.*, | ) |
| | ) |
| Defendants. | ) |

### MEMORANDUM OPINION

**United States District Judge Susan Paradise Baxter**

This case comes before the undersigned for an award of damages following entry of default judgment against Defendant Craig Griffin ("Griffin"). Based on the findings set forth below, the Court will award Plaintiff's compensatory damages in the amount of $4,000. Plaintiff's supplemental motion for punitive damages, ECF No. [287], will be denied.

I.     BACKGROUND

Plaintiff David V. Jordan is an inmate in the custody of the Pennsylvania Department of Corrections ("DOC"). At times relevant to this lawsuit, he was housed at the State Correctional Institution at Forest ("SCI-Forest"). His complaint in this case, docketed in September of 2018, asserted seven claims under 42 U.S.C. §1983 against fourteen individuals, all of whom worked at SCI Forest as corrections officials or health care providers. The matter was referred to Chief United States Magistrate Judge Richard A. Lanzillo for pretrial proceedings in accordance with the Magistrates Act, 28 U.S.C. §636(b)(1), and Rule 72 of the Local Civil Rules of this Court.

Plaintiff's claims against Griffin originate from an incident that occurred on

1

May 1, 2016.[1] It is alleged that, on that date, Griffin and Corrections Officials Baumcratz handcuffed him and removed him from his cell. ECF No. 3, ¶21. The two officers then conducted a security cell inspection that was intended to harass Plaintiff in retaliation for his previous lawsuit against Corrections Officer Jordan Drayer. *Id.* ¶¶ 22, 42-44. While kicking his legal papers around, Griffin told Plaintiff to "quit filing shit." *Id.* ¶23. Then, while Plaintiff was handcuffed from behind, Drayer and Baumcratz pushed Plaintiff against the wall and began to assault him. *Id.* ¶¶25-27. According to the complaint, Drayer and Baumcratz punched Plaintiff multiple times in the back of his head, slammed his head repeatedly against the wall, choked him, twisted his fingers, and slammed him forcefully to the ground. *Id.* ¶28. During this assault, Griffin, Sergeant Cochran, Corrections Officer Lutz, and Corrections Officer Palmer were all present but took no action to intervene or stop the beating. *Id.* ¶29. Plaintiff was then placed on his stomach while Cochran and Palmer affixed a tether to his handcuffs. *Id.* ¶¶31-32. Then, at the direction of Lieutenant Murin, Griffin -- along with Cochran, Palmer, Lutz, and Drayer -- pulled Plaintiff to his cell door, violently yanking on the tether, which caused Plaintiff to be dragged backward on his knees for approximately ten feet. *Id.* ¶¶35-36. Plaintiff claims that, as a result of these actions, he suffered "extreme pain in his wrists, lower back, knees, and neck," "a permanent loss of feeling in his left thumb," and "permanent disfigurement in the form of mild scoliosis and curvature and narrowing of the C-5 – C-6 and C-6 – C-7 disc spaces . . . with degeneration changes." *Id.* ¶¶37-39. Additionally, Plaintiff states that he has suffered "a curved spinal cord coupled with arthritis . . . of the lower back," which continues to cause "pain and back spasms and other related damages . . . ." *Id.* ¶40. Plaintiff claims that, because of these injuries, his "ability to attend certain daily activities has been adversely impacted and he

---

[1] The background facts are derived from Plaintiff's complaint, the operative pleading. ECF No. 3.

continues to suffer mental and emotional distress, anxiety, fear, embarrassment, and humiliation." *Id.* ¶41.

Based on these averments, Plaintiff asserted three claims against Griffin.  In Count I of the complaint, Plaintiff alleges that Griffin and others engaged in excessive force in connection with his (mis)use of the tether, in violation of Plaintiff's Eighth Amendment rights.  ECF No. 3, ¶¶148-155.  In Count II, Plaintiff alleges that Griffin and Baumcratz retaliated against him for filing lawsuits and grievances, in violation of his First Amendment rights. *Id.* ¶¶156-162.  In Count III, Plaintiff alleges that Griffin and others violated his rights by refusing to intervene while he was being assaulted by Drayer and Baumcratz. *Id.* ¶¶168-170.

On November 28, 2018, counsel from the Pennsylvania Attorney General's office entered his appearance on behalf of Griffin and nine other individuals (collectively, the "DOC Defendants") and waived formal service of the complaint. ECF Nos. 33, 34.  Thereafter, extensive pretrial litigation ensued, owing substantially to the parties' ongoing discovery disputes, their robust dispositive motions practice, and numerous complications and delays arising out of the Covid-19 pandemic.

During the pretrial litigation phase, Plaintiff filed numerous motions to compel the production of discovery.  ECF Nos. 79, 80, 83, 84, and 85.  On December 16, 2019, Judge Lanzillo granted Plaintiff's motion to compel Griffin to respond to written discovery requests, setting a deadline of January 10, 2020.  ECF No. 98.  The Court cautioned that additional failures by Griffin to respond properly to Plaintiff's discovery requests would lead to the imposition of sanctions, including the possible entry of a default judgment. *Id.*  Despite this admonition, Griffin failed to respond to Plaintiff's discovery.  ECF No. 148 at 2.

Accordingly, Plaintiff filed two motions for a default judgment against Griffin. ECF Nos. 117 and 119. Judge Lanzillo held a hearing on April 23, 2020, during which time counsel from the Attorney General's office stated his intention to discontinue representation of Griffin due to Griffin's ongoing failure to respond or participate in his own defense. ECF No. 144 at 5-8. Defense counsel represented that multiple attempts had been made to reach Griffin using his last known mailing address, email addresses, and cell phone numbers. *Id.*; *see* ECF No. 148 at 4-5. Indeed, the record confirms that Griffin was aware of the outstanding discovery requests through an email exchange with defense counsel's investigator. ECF No. 154. Still, Griffin failed to communicate with his attorney and made no attempt to complete discovery responses. *Id.*; *see* ECF No. 144 at 5-8; ECF No. 148 at 4-5.

Consequently, on June 1, 2020, Judge Lanzillo issued a Report and Recommendation ("R&R") wherein he undertook a *Poulis* analysis[2] and concluded that the balance of factors supported entry of a default judgment against Griffin, pursuant to Federal Rule of Civil Procedure 37. ECF No. 148. Judge Lanzillo also granted the Attorney General's motion to withdraw as counsel for Griffin. ECF No. 154, 155. On June 30, 2020, this Court adopted Judge Lanzillo's Report and Recommendation and entered a default judgment against Griffin as to Counts I, II, and III of the Complaint. ECF No. 152.

Numerous times during the pretrial phase of this case, Plaintiff moved for entry of a damages award against Griffin, but the Court denied Plaintiff's pretrial motions for damages as premature. *See* ECF Nos. 150, 165, 195, 203, 206; *see also* ECF Nos. 157, 167, 169, 215, 232. Meanwhile, litigation proceeded against the remaining Defendants in this case. Following the Court's resolution of various Rule 56 motions, the case was referred back to the undersigned in

---

[2] *See Poulis v. State Farm Fire & Cas. Co.,* 747 F.2d 863, 868 (3d Cir. 1984).

4

March 2021 for trial against DOC Defendants Baumcratz, Cochran, Drayer, Jordan, Kosarek, Laroche, Lutz and Murin. ECF No. 189. Trial was tentatively scheduled for August 2021 but later continued to April 2022, due in part to complications presented by the Covid-19 pandemic. *See* ECF No. 201, 248. Then, on March 24, 2022, the remaining DOC Defendants notified the Court that they had reached a settlement, leaving only the claims against Griffin for final resolution. ECF No. 265.

The Court held a video conference hearing on damages in October 2022 at which Plaintiff and counsel from the Attorney General's office appeared.[3] During the hearing, Plaintiff testified concerning his medical history and alleged injuries. *See* EC No. 290. The Court also allowed Plaintiff to file a post-hearing submission in support of his damages request. *See* ECF Nos. 286 to 288. At this point, the Court has reviewed the entirety of the record as it relates to Plaintiff's request for damages and is now prepared to issue its ruling.

## II.     DISCUSSION

Federal Rule of Civil Procedure 55 establishes a two-step process for entry of a default judgment. First, a party must obtain an entry of default under Rule 55(a); then Rule 55(b) allows the court to enter a default judgment on motion by the non-defaulting party. Fed. R. Civ. P. 55.

Here, the Court entered default judgment pursuant to Rule 37 as a sanction for Griffin's delinquencies during the discovery process. It now falls to the Court to determine whether Plaintiff is entitled to the damages he is seeking. In doing so, the Court may not simply accept as true the damages alleged in the complaint; instead, the Court must satisfy itself that the

---

[3] Defense counsel did not represent Griffin at the hearing but appeared for the convenience of the Court.

calculation of damages is correct. *Russell v. Mimi's Café and Market,* Civil Action No. 21-3826, 2023 WL 158210 at *4 (E.D. Pa. Jan. 11, 2023); *see Mahco, Inc. v. Sovereign Logistics, Ltd.,* Civil Action No. 19-14742, 2020 WL 3249096, at *2 (D.N.J. June 16, 2020) ("A consequence of the entry of a default judgment is that 'the factual allegations of the complaint, except those relating to the amount of damages, will be taken as true.'") (quoting *Comdyne I, Inc. v. Corbin*, 908 F.2d 1142, 1149 (3d Cir. 1990)). As the party who sought default judgment, Plaintiff bears the burden of proving his damages. *Mahco, Inc.,* 2020 WL 3249096, at *2.

   A. <u>Compensatory Damages</u>

Plaintiff asserted his claims in this case under 42 U.S.C. §1983. Section 1983 allows for the award of compensatory damages, which are intended to make the Plaintiff whole. *Wallace v. Powell*, No. 3:09-cv-286, 2022 WL 3447197, at *14 (M.D. Pa. Aug. 16, 2022). In Section 1983 cases, compensatory damages are governed by general tort-law compensation theory. *Wallace*, at *14; *see Allah v. Al-Hafeez*, 226 F.3d 247, 250 (3d Cir. 2000). Compensable harms may include monetary injury and "out-of-pocket" losses as well as noneconomic losses such as impairment of reputation, humiliation, and mental anguish and suffering. *Wallace*, at *14; *Allah*, 226 F.3d at 250.

Under Pennsylvania law, there is no requirement that a damage calculation meet a standard of mathematical certainty. *See Russell*, 2023 WL 158210 at *4 (citing *J.W.S. Delavau, Inc. v. E. Am. Transp. & Warehousing, Inc.*, 810 A.2d 672, 687 (Pa. Super. Ct. 2002). The standard is reasonableness based on all the evidence and affidavits submitted by the moving party. *Id.* (citing *J&J Sports Prods., Inc. v. Roach*, No. 07-cv-5059, 2008 WL 8901291 (E.D. Pa.

6

July 8, 2008)). A plaintiff's noneconomic damages cannot be precisely calculated. *Wallace*, 2022 WL 3447197, at *14; *see Allah v. Al-Hafeez*, 226 F.3d 247, 250 (3d Cir. 2000).

One caveat to recovery arises from the Prison Litigation Reform Act ("PLRA"), 42 U.S.C. §1997e(e), which states that "[n]o Federal civil action may be brought by a prisoner confined in a jail, prison, or other correctional facility, for mental or emotional injury suffered while in custody without a prior showing of physical injury." This provision requires a showing of "more-than-de minimis physical injury as a predicate to allegations of emotional injury." *Mitchell v. Horn*, 318 F.3d 523, 536 (3d Cir. 2003). Here, that requirement is met, as Plaintiff has adduced evidence of ongoing complaints of pain for which he sought medical treatment and received prescription medication. *See Perez v. United States*, 330 F. App'x 388, 389 (3d Cir. May 22, 2009) (citing *Luong v. Hatt*, 979 F. Supp. 481, 486 (N.D. Tex. 1997) and noting that "in *Luong*, the court distinguished those injuries that resolve with home treatment from those injuries that require a visit to an emergency room or a doctor, assessing the former as *de minimis*"); *In re Bayside Prison Litig.*, Civil No. 09-2365, 2010 WL 4916716 (D.N.J. Nov. 23, 2010) (citing *Luong* and noting "the prevailing view is that 'physical injury is an observable or diagnosable medical condition requiring treatment by a medical care professional. It is not a sore muscle, an aching back, a scratch, an abrasion, a bruise, etc., which lasts even up to two or three weeks... "); *cf. Newman v. Burrows*, No. 2:22-CV-00556, 2023 WL 4360554, at *11 (W.D. Pa. May 3, 2023), ("Courts have found that allegations of pain without medical treatment allege only a *de minimis* injury.") (citing authority), *report and recommendation adopted*, No. CV 22-556, 2023 WL 4100401 (W.D. Pa. June 21, 2023). Accordingly, Plaintiff is not precluded from receiving compensatory damages for any mental or emotional injury stemming from the May 1, 2016 incident.

7

In his complaint, Plaintiff requested compensatory damages in the total amount of $970,000, *to wit*: $450,000 for his pain and suffering; $500,000 for his "permanent injuries, disfigurement and losses"; and $20,000 for his "severe mental and emotional distress." ECF No. 3 at 24. Specifically, Plaintiff claims to have suffered: (1) permanent disfigurement of his spine, (2) pain and suffering arising from injuries to his neck, back, wrists, and left thumb, and (3) emotional and mental distress and loss of enjoyment of life. As previously noted, the complaint originally named fourteen individuals as Defendants. With regard to Griffin, Plaintiff requests compensatory damages in the amount of $69,285.75, which equates to Griffin's one-fourteenth (1/14) "share" of the $970,000 figure sought in the complaint.

In assessing Plaintiff's claim for damages, the undersigned has considered all of the evidence submitted in connection with Plaintiff February 7, 2022 Motion for Damages, including his affidavit dated October 23, 2020. *See* ECF No. 250, 251, 252, 253, 254. The Court has also considered Plaintiff's sworn testimony, which was received during the October 17, 2022 hearing. ECF No. 290 ("Hrg. Tr."). Finally, the Court has considered Plaintiff's post-hearing submissions, including his supporting brief, his medical and mental health records, the appended medical literature, Plaintiff's prison grievances, his sick call forms, and his inmate request records. *See generally* ECF Nos. 286, 287, 288.

   *1. Plaintiff's Damages Claim for "Permanent Disfigurement"*

The Court first considers Plaintiff's claims of permanent disfigurement of his spine. On May 9, 2016, approximately one week after the alleged assault, an x-ray of Plaintiff's cervical spine showed mild scoliosis and reversal of curvature with degenerative changes at C5-C6 and C6-C7. ECF No. 286-1 at 9. There was a narrowing of the C5-C6 and C6-C7 disc spaces, but the vertebral body heights were well maintained and prevertebral soft tissue

8

structures were intact. No fracture or dislocation was seen. *Id.* Two years later, on June 29, 2018, Plaintiff underwent an x-ray of his lumbar spine. This showed mild scoliosis, possibly due to spasm, and mild degenerative changes, but no fracture or dislocation. *Id*. at 16. The study noted "some artifact on the images as well as multiple radiodensities, of uncertain significance." *Id.* Plaintiff underwent back x-rays again on September 24, 2019. On that date, his cervical spine again showed a reversal of the normal cervical lordosis and "disc space narrowing and/or endplate/uncovertebral spurring of a moderate degree at the C5-C6 level. However, there was still no evidence of acute fracture, subluxation or prevertebral soft tissue swelling, and the vertebral body heights were well maintained. *Id.* at 28. Views of the lumbosacral spine showed degenerative changes of the lower dorsal region and posterior facet hypertrophic changes at the lumbosacral junction. *Id.* at 29. However, there was no evidence of acute fracture, spondylolysis, spondylolisthesis, or scoliosis. *Id.*

Plaintiff attributes the changes in his spine to the trauma he endured during the May 1, 2016 incident. He points out that x-rays taken in 1998 and 2006 showed no injuries or abnormalities in his cervical or lumbar areas. *See* ECF No. 286-1 at 2-4. But in this Court's assessment, x-rays taken 10 to 18 years prior to the May 1, 2016 incident are too remote to be probative evidence of causation, as they do not rule out the possibility that the changes in Plaintiff's spine may have resulted from other causes, including normal degeneration that can occur from wear and tear over time.

Plaintiff has supplied medical literature indicating that scoliosis can sometimes be caused by injury; however, that same literature acknowledges that scoliosis is a common condition which can occur from a number of different causes, and "the cause is unknown in most of the cases." ECF No. 286-3 at 8. Here, the record is devoid of any diagnosis of traumatically induced

scoliosis and, notably, a board-certified radiologist who reviewed Plaintiff's June 2018 lumbar spine x-rays opined that his scoliosis "may be due to spasm." ECF No. 286-1 at 16.

Similarly, no treating doctor or medical expert has attributed the narrowing of Plaintiffs disc space to trauma from Griffin's use of the tether. In fact, the literature Plaintiff supplied regarding degenerative disc disease in the cervical spine discusses how the C6-C7 disc can lose its cushioning and height "during the normal aging process," placing stress on the facet joints and causing degenerative problems. ECF No. 286-3 at 11.

The Court also notes that, two months prior to the incident with the tether, Plaintiff sought medication for pain in his lower back (as well as his left knee/leg), for which he was prescribed Relafen. ECF No. 286-1 at 5. And his exams following the May 1, 2016 incident did not reveal signs of traumatic injury such as bruising, swelling, incontinence, or unsteady gait. *Id.* at 6-8.

As for the "artifacts" that were noted in the x-ray of Plaintiff's lumbar spine, it is unclear whether those are indicative of further degenerative changes, a defect in the radiographic technique, or some other cause source, such as bullet fragments from a prior gunshot wound.[4]

In sum, given the state of the evidentiary record and the lack of any expert testimony to establish causation, the Court is not persuaded that Griffin's use of the tether is a causal factor of any "permanent disfigurement" in Plaintiff's spine. Therefore, the Court will not award damages for this alleged injury.

---

[4] Treatment notes from a July 11, 2018 sick call appointment include a notation that suggests the provider was questioning whether Plaintiff's prior gunshot wound might be related to artifacts and radiodensities on his x-rays. ECF No. 286-1 at 18. *See also* ECF No. 286-1 at 13 (January 19, 2017 x-ray indicating a healed fracture of the distal femur with bullet fragments).

   *2. Plaintiff's Damages Claim for Pain and Suffering*

Plaintiff also requests damages for pain and suffering related to injuries of his back, neck, wrist, and left thumb. Regarding Plaintiff's back and neck pain, the records suggest that Plaintiff sought treatment between May and September of 2016, which is consistent with some degree of injury/aggravation resulting from the May 1, 2016 incident. Plaintiff sought treatment again between June and August of 2018 which, in the Court's view, is less likely related to the May 1, 2016 incident and more likely the result of chronic degenerative changes in Plaintiff's cervical and lumbar regions. On balance, however, Plaintiff's treatment notes support the existence of mild to moderate symptoms for which Plaintiff has received conservative treatment in the form of NSAIDs, muscle relaxers, and physical therapy. Most recently, Plaintiff has been prescribed physical therapy and Voltaren (an NSAID) for his back pain. Hrg. Tr. at 11. The treatment notes do not evidence a history of radiculopathy, acute injury to the back, or any need for surgical intervention. They do suggest, however, that Plaintiff's health providers view him as somewhat anxious, dramatic, and inclined to exaggerate his symptoms. *See, e.g.,* ECF No. 286-1 at 15, 18, 22, 23. Although the Court does credit Plaintiff's claims of back and neck pain, it does not fully credit his testimony to the extent he claims severe debilitation from his symptoms. Moreover, the Court finds that any pain and suffering related to Griffin's use of the tether, as opposed to Plaintiff's degenerative back condition, was likely short term.

Plaintiff also claims that, as a result of being handcuffed and dragged with the tether, he lost feeling in his left thumb. At the evidentiary hearing, Plaintiff confirmed that this is a past issue, not an injury that still persists. A review of Plaintiff's medical records shows that Plaintiff's only treatment for his thumb occurred on May 5, 2016, when he reported numbness but no pain. ECF No. 286-1 at 7-8. Examination revealed no discoloration, full range of motion,

and 5/5 strength in abduction. *Id.* at 7. An x-ray was supposed to be ordered for his left hand, but it does not appear this was ever completed. *Id.* at 8. Plaintiff's sick call records suggest that he continued to complain of loss of feeling in his thumb between May 3 and May 15, 2016. ECF No. 286-5 at 2-7. While the Court credits Plaintiff's assertion that he experienced temporary numbness in his thumb, there is no credible evidence to suggest that he lost significant functionary abilities in his left hand in the weeks and months following the May 1, 2016 incident.

Regarding his alleged wrist injury, Plaintiff asserts that he documented his complaints in several sick call slips, seeking medical attention. He was seen on May 5, 2016, at which time he exhibited a full range of motion. ECF No. 286-1. The record supports the conclusion that Plaintiff experienced moderate, short-term pain in his wrist as a result of Griffin's use of the tether on May 1, 2016.

Based on these considerations, the Court finds that Plaintiff is entitled to an award of $2,500 for his past physical pain and suffering. The Court further finds that Plaintiff has not proven damages for ongoing or future physical pain and suffering related to the actions of Griffin on May 1, 2016.

   3. *Plaintiff's Damages Claim for Emotional Distress and Loss of Enjoyment of Life*

Plaintiff also seeks damages for mental anguish/distress, embarrassment, humiliation, and loss of enjoyment of life and life's pleasures. In assessing this aspect of his claim, the Court partially credits Plaintiff's testimony that he was traumatized from the events of May 1, 2016. Accepting as true Plaintiff's allegations about his beating and Griffin's forceful use of the tether, it is logical to expect that the Plaintiff would have experienced some degree of mental distress, humiliation, and fear as a result of those events.

On the other hand, the Court does not fully credit Plaintiff's testimony regarding the extent of his emotional damages, as some of his assertions are belied by the evidentiary record. For example, Plaintiff points to the changes in his spine and resulting pain as a source of his mental distress; but the Court has already determined that there is insufficient evidence to establish that Griffin was responsible for causing any permanent deformity in Plaintiff's spine. Plaintiff also points to an incident that occurred on May 8, 2016 – one week after the events in question – as evidence of his mental distress. On that date, Plaintiff received a misconduct for refusing to obey Lutz's order to "cuff up" and exit his cell. ECF No. 286-2 at 3. Plaintiff has maintained that he refused the order because he was still afraid of Lutz as a result of Lutz's participation in the May 1 assault. *Id.* at 4. However, it appears that the Program Review Committee rejected this explanation, noting that Plaintiff "has been found guilty of Refusing to Obey Orders 23 separate times since his arrival in 2003." *Id.* at 6. Plaintiff also points to records showing that he was referred to SCI-Camp Hill for a psychological evaluation after appearing manic and psychotic and expressing homicidal ideations on May 20, 2016. *Id.* at 7-8; Hrg. Tr. at 27-28. On June 30, 2016, he again reported suicidal ideations, which he states were related to his fear of being returned to SCI-Forest. ECF No. 286-2 at 9-10; Hrg. Tr. at 27-28. But when Plaintiff was seen that day by psychiatric staff, they assessed no active mental health diagnosis that required treatment and cleared him for a transfer. ECF No. 286-2 at 12. Psychiatric staff members reported that Plaintiff was not delusional or paranoid on June 30, 2016 and did not express homicidal or suicidal ideation. *Id.* at 11-12. They did note, however, that Plaintiff exhibited controlling behavior, attempted to dictate the conditions of his psychiatric interview, and was over dramatizing "non-specific complaints." *Id.* at 11.

13

Apart from these considerations, Plaintiff's treatment notes and medication records suggest that he has a history of mental health issues that predate the May 1, 2016 incident. *See, e.g.,* ECF No. 286-1 at 32, 34 (indicating that a psychiatric provider prescribed Melatonin, Sertraline, and Lithium for Plaintiff in 2015; further indicating a diagnosis at that time of "unspecified bipolar and related disorder"); ECF No. 286-2 at 9 (June 30, 2016 treatment note indicating that Plaintiff was "last seen by Psychiatry: 2/23/16"). Thus, the Court must account for the fact that some of Plaintiff's emotional difficulties may be related to preexisting conditions, separate and apart from the trauma he endured on May 1, 2016.

Moreover, to the extent Plaintiff's mental distress was related to fear he experienced while incarcerated at SCI-Forest, it is noteworthy that Plaintiff left that institution at some point prior to filing this lawsuit in August of 2018. He is currently housed at SCI-Phoenix and testified that he is no longer experiencing problems with abuse by prison officials, has "retired" from filing grievances, and is able to socialize and communicate with others. Hrg. Tr. at 20. He states that, in January 2017, he began taking Ziprasidone for manic depression, sleep impairment, and regulation of his mood and emotions. ECF No. 286 at 22; ECF No. 286-1 at 45.

To the extent Plaintiff claims a loss of life's enjoyment, the Court must account for the fact that Plaintiff is an incarcerated individual and, by that status, already faces significant limitations in his ability to partake in many of life's enjoyments, as compared to non-incarcerated individuals. In any event, Plaintiff has not expounded to any significant degree about the types of activities he is no longer capable of undertaking as a result of his alleged injuries.

Finally, as previously discussed, Plaintiff's treatment notes suggest a tendency to dramatize and exaggerate his symptoms. This is borne out to some degree by the Court's own

perceptions. During the course of this lengthy litigation, the undersigned has had the opportunity to interact with Plaintiff on numerous occasions. While Plaintiff seems to be a sincere and intelligent individual, he does also, in this Court's assessment, tend to exaggerate his claims. Therefore, while the undersigned credits Plaintiff's assertion that he experienced some past emotional trauma from Griffin's actions on May 1, 2016 incident, the Court does not credit Plaintiff's testimony to the full extent of the damages that have been alleged. The Court will award Plaintiff $1,500 to compensate him for his past emotional distress resulting from Griffin's actions on May 1, 2016. The Court is not persuaded that Plaintiff has proven ongoing emotional distress damages related to Griffin's conduct.[5]

   4.  *Summary of the Court's Compensatory Damages Award*

In sum, based on all of the foregoing considerations, the Court finds that Plaintiff's claim for $970,000 in damages is grossly overstated as compared to what the evidence persuasively supports. Therefore, Plaintiff has not fully carried his burden of proving his claimed damages. Instead, based on a thorough review of the record and the undersigned's own experience adjudicating civil rights cases, the Court finds that Plaintiff is entitled to $2,500 for his past physical pain and suffering and $1,500 for his past emotional pain and suffering. Adding these amounts together, the total figure of compensatory damages in this case is $4,000. And because Plaintiff's allegations suggest that Griffin participated with others to produce an indivisible injury, Griffin's liability is joint and several.[6] *See Niblack v. Murray,* Civil Action No. 12-6910,

---

[5] Plaintiff has cited two cases in support of his claim for emotional damages: *Glass v. Snellbaker*, Civil Action No. 05-1971 2008 WL 4371760 (D.N.J. Sept. 17, 2008), and *Wade v. Colaner*, Civil Action No. 06-3715, 2010 WL 5479629 (D.N.J. Dec. 28, 2010). The Court declines to model its verdict on the awards in those cases, as it finds the facts of those cases to be materially distinguishable from the instant case.

[6] "Joint and several liability is a theory of recovery which requires that the plaintiffs, in an action alleging tortious or constitutionally repugnant conduct by multiple actors, establish that each defendant acted in concert to produce a single, indivisible injury." *Harper v. Albert*, 400 F.3d 1052, 1061-62 (7th Cir. 2005); *see also Jackson v. City of*

2016 WL 4086775 (D.N.J. July 29, 2016) (citing authority and explaining that "[a]lthough the Third Circuit has not ruled on this issue, a majority of the circuit courts have applied the doctrine of joint and several liability and indivisible injury to §1983 claims"); *see also Borrell v. Bloomsburg Univ.,* 207 F. Supp. 3d 454, 476 (M.D. Pa. 2019) (noting that "it is improper to allocate 'damages between the parties for [a] single indivisible injury'") (quoting *Thomas v. Cook Cty. Sheriff's Dep't,* 604 F.3d 293, 311 (7th Cir.2010)). The Court will therefore enter a judgment against Griffin in the amount of $4,000 as compensatory damages.

B. Punitive Damages

In his post-hearing filings, Plaintiff seeks a separate award of punitive damages against Griffin in the amount of $50,000. ECF No. 286 at 26. He did not, however, include a request for punitive damages in his complaint. Instead, the complaint sought only compensatory damages in the aggregate amount of $970,000. ECF No. 3. Under Rule 54, "[a] default judgment must not differ in kind from, or exceed in amount, what is demanded in the pleadings." Fed. R. Civ. P. 54(c). Punitive damages differ from compensatory damages in that the latter are intended to make a plaintiff whole, *see Wallace v. Powell*, No. 3:09-cv-286, 2022 WL 3447197, *14 (M.D. Pa. Aug. 16, 2022), whereas punitive damages serve "deterrence and retribution" functions. *Id.* at *16. Because Plaintiff did not include a request for punitive damages in his complaint, the Court cannot award them now. Accordingly, Plaintiff's Supplemental Motion for Damages, ECF No. 287, which concerns his request for punitive damages, will be denied.

---

*Pittsburg,* 518 F. App'x 518, 520-21 (9th Cir. 2013) (finding a defendant in a Section 1983 case liable for the entire compensatory damages award because his unconstitutional conduct "was a proximate cause of [the plaintiff's] indivisible injuries").

16

### III. CONCLUSION

For the reasons set forth above, the Court finds that Plaintiff is entitled to an award of compensatory damages in the amount of $4,000. Plaintiff's supplemental motion for punitive damages, ECF No. [287], will be denied.

An appropriate Order of Judgment will be entered accordingly.

*Susan Paradise Baxter*
SUSAN PARADISE BAXTER
United States District Judge